IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN HARTSHORN,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:10-CV-0638<br><br>Judge Clark Waddoups |

## INTRODUCTION

In this action, the United States seeks injunctions under 26 U.S.C. §§ 7402 and 7408, alleging that Defendant Kevin Hartshorn violated 26 U.S.C. §§ 6700, 6701 and unlawfully interfered with enforcement of Internal Revenue laws. (Dkt. No. 1, 12-14.) The government now moves for summary judgment on all three counts in the complaint. (Dkt. No. 14.) For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are supported by the evidence submitted by the United States and are undisputed by the Defendant. Kevin Hartshorn currently serves as a senior minister for the Church of Compassionate Service (the "Church"). The Church was organized by Hartshorn in its present form in 2004, at which time he was appointed head minister. Hartshorn created the Church's "Book of Church Order" and the "Minister's Handbook," which is used by and furnished to Church ministers. Hartshorn also drafted, or assisted in drafting, other church documents, including the vows of poverty and obedience and agency assignment.

The Church requires a member who becomes a minister to take vows of poverty and obedience.  Presently, there are approximately 50 active ministers.  Upon taking the vow of poverty, ministers are required to renounce all their worldly possessions.  To comply with this requirement, they transfer title to all personal property to a trust created by the Church and quit-claim their real property to the Church, which the Church then also quit-claims to a trust.  In addition, ministers assign to the Church all income that is earned as a part of their normal employment.  In some instances, the ministers receive the check from their employer and then endorse it in favor of the Church.  In other cases, their earnings, at the direction of the minister, are deposited directly into accounts controlled by the Church.  The Church provides the ministers with a debit card from a Church account which they use for their necessary living expenses.  The Church also pays the mortgage, if any, on the home and other related home expenses.  Although, the Church maintains the right to refuse payment of the minister's expenses, Hartshorn has offered no evidence of any request by a minister for an expense that the Church has denied.

The Church refers to the home in which ministers and their families reside as a "parsonage."  The Minister's Handbook declares that the parsonage and its effects, which include all of the home's contents, are held in trust for the benefit of the Church.  The ministers also sign a "Stewardship Agreement" agreeing to operate and manage the parsonage and parsonage effects.

Hartshorn has assisted other ministers in executing a vow of poverty and transferring their property to the Church and has discussed with them the tax consequences of taking these actions.  In summary, Hartshorn has explained, often with reference to I.R.S. materials, that as ministers of the Church they are not required to pay taxes on income they earn which has been assigned to the Church.

In support of its motion for summary judgment, the United States has provided details as to the practices of several ministers.  It relies, however, primarily on the conduct of Bruce

Calkins and Hartshorn's interactions with him.  Mr. Calkins is a Church minister and has taken a

vow of poverty.  He earns approximately $60,000 per year as a histotechnologist for Kaiser

Permanente where he is a Form W-2 wage employee.  Mr. Calkins worked in the same position

prior to becoming a Church minister.  Upon taking a vow of poverty, Mr. Calkins declared that

he was giving all of his possessions to the Church, including his car.  He also assigned his pay

from Kaiser Permanente to the Church, and directed that his paycheck be deposited directly into

a Church account.  Nevertheless, Mr. Calkins continues to receive his employee benefits from

Kaiser Permanente, including health care, sick leave, and vacation days.  Prior to becoming a

Church minister, Mr. Calkins had directed Kaiser Permanente to deposit his paycheck into a

personal account bearing his name.

Hartshorn acknowledges that the Church did not help Mr. Calkins find his job with

Kaiser Permanente, does not exercise any control over the work that he performs for Kaiser

Permanente, and has not entered into any contract with Kaiser Permanente for the Church to

provide the services performed by Mr. Calkins.  Hartshorn does not dispute that the income Mr.

Calkins earns as a histotechnologist for Kaiser Permanente would be taxable were he not a

minister with the Church.  Mr. Calkins last filed a federal income tax return in 2000.

## STANDARD OF REVIEW

Summary judgment will be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while

a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-

moving party based on the evidence presented."  *Chasteen v. UNISIA JECS Corp.*, 216 F.3d

1212, 1216 (10th Cir. 2000).  Although "[t]he movant has the burden of showing that there is no

genuine issue of fact," the opposing party "is not thereby relieved of his own burden of

producing . . . evidence that would support a jury verdict."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986).  Likewise, the role of the Court is not to weigh the evidence, but to

"determine whether there is a genuine issue for trial."  *Id.* at 249.

## DISCUSSION

I.  **The United States is Entitled to an Injunction under I.R.C. § 7408 to Enjoin Hartshorn's Conduct as Being Subject to Penalty Under § 6700.**

Under the Internal Revenue Code, the court "may enjoin [a] person from engaging in . . .

activity subject to penalty under this title."  I.R.C. § 7408(b).  Such activity includes the

promotion of abusive tax shelters under I.R.C. § 6700.  The courts have listed five requirements

for such an injunction to issue:

> The government must prove five elements to obtain an injunction under these statutes: (1) the defendants organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) they made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) they knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct

*United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000).

The court will consider each of these elements in turn.

### A.  Hartshorn Organized or Participated in the Organization of a Plan.

The Seventh Circuit has noted that "[u]nder § 6700 any 'plan or arrangement' having

some connection to taxes can serve as a 'tax shelter.'"  *United States v. Raymond*, 228 F.3d 804,

811 (7th Cir. 2000).  The United States argues that it is undisputed that Hartshorn organized the

Church in its present form in 2004 and that the Church claims that, under its precepts and

practices, the income of its ministers are exempt from income and other taxes.  (Dkt. No. 27, 4-

5.)  Indeed, the Minister's Handbook, written by Hartshorn, states that ministers no longer have

taxable income once they have taken the vow of poverty because "[w]hen ministers of the Order

take the Vow of Poverty, even the I.R.S. recognizes that they have no income and that any

income that they would receive belongs to the religious order."  (Dkt. No. 27, 4-5.)  The United

States further argues that it is undisputed that ministers, following Hartshorn's advice, have not

filed tax returns for the years during which they have been ministers.  (Dkt. No. 27, 25.)  The

United States argues that these facts are sufficient to prove that Mr. Hartshorn organized a plan

or arrangement that can serve as a tax shelter within the meaning of I.R.C. § 6700.  (Dkt. No. 27,

4-5.)

      Hartshorn opposes the government's argument by attempting to justify the Church as a

legitimate church.  (Dkt. No. 18, 50-54.)  To satisfy this element, however, it is not necessary for

the government to prove the Church is a sham.  For purposes of this motion, the court assumes

that the Church is legitimate.  But even assuming this fact, Hartshorn's opposition fails.  He

provides no support for the proposition that even a legitimate church is exempted from the

requirements of § 6700.[1]  Hartshorn concedes that he had a hand in the organization of the

Church and it is undisputed that ministers following the Church's practices, which were

primarily prescribed by Hardshorn, do not pay taxes.  This evidence is sufficient to meet the first

element for an injunction under § 6700.  (Dkt. No. 32, 3.)

### B.  Hartshorn Made False or Fraudulent Statements about Tax Benefits.

      The United States contends that Hartshorn "falsely promises prospective 'church

ministers' that they can eliminate their federal income taxes by executing a 'vow of poverty,'

refuse to file federal income tax returns, and legally put their income and assets beyond the reach

of the I.R.S.."  (Dkt. No. 27, 6.)  The government argues that such statements are false or

fraudulent under (1) the anticipatory assignment of income doctrine; and (2) under a nominee

fraud theory.  The court will first consider whether the United States prevails under the

anticipatory assignment of income doctrine.

---

[1]    Defendant cites one case in his opposition, *United States v. Raymond*, for the proposition that "section 6700 is aimed at tax scam plans sold off to individuals . . . rather than the religious organization here."  (Dkt. No. 18, 54) *citing* 228 F.3d 804, 811 (7th Cir. 2000).  But this case makes no such differentiation.  Indeed, neither the word "religion" nor "church" can be found anywhere in the opinion.

### i.    The Anticipatory Assignment of Income Doctrine

The Supreme Court has explained the anticipatory assignment of income doctrine as

follows:

> A taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party.  The rationale for the so-called anticipatory assignment of income doctrine is the principle that gains should be taxed "to those who earned them," a maxim we have called "the first principle of income taxation."  The anticipatory assignment doctrine is meant to prevent taxpayers from avoiding taxation through arrangements and contracts however skillfully devised to prevent [income] when paid from vesting even for a second in the man who earned it.
>
> In an ordinary case attribution of income is resolved by asking whether a taxpayer exercises complete dominion over the income in question.  In the context of anticipatory assignments, however, the assignor often does not have dominion over the income at the moment of receipt.  In that instance the question becomes whether the assignor retains dominion over the income-generating asset, because the taxpayer who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants.  Looking to control over the income-generating asset, then, preserves the principle that income should be taxed to the party who earns the income and enjoys the consequent benefits.

*Comm'r v. Banks*, 543 U.S. 426, 433-435 (U.S. 2005) (citations omitted).

Although the Tenth Circuit has not addressed this precise issue, it has been addressed by

other Courts of Appeals.[2]  The Eighth Circuit has stated, "[t]o prove assignment of income on an

agency theory, the taxpayers . . . must show that a contractual relationship existed between their

secular employers and the religious order, and that the religious order controlled or restricted the

taxpayers' use of the money purportedly turned over to the order."  *Page v. Commissioner of

Internal Revenue*, 823 F.2d 1263, 1270 (8th Cir. 1987) (citing *Mone v. Commissioner*, 774 F.2d

570 (2d Cir. 1985)); *see also Pollard v. Commissioner of Internal Revenue Service*, 786 F.2d

1063, 1065 (8th Cir. 1986) (noting the agent-principal relationship theory is followed by the

---

[2]       The government argues that there are two approaches.  Given that *Pollard* (cited by the government as the majority approach) cites *Fogarty* for its own support (which is also cited by the government as the minority approach), this distinction is not so clear.  This court views them as one and the same, only with slightly different

Federal Circuit, and the Second, Third, and Sixth Circuits).[3]  This approach may be referred to as the "agency agreement" approach.  Such an approach draws a bright line: absent evidence of a contract between the religious order and the employer, the income is taxable to the employee, no matter the bona fide of his relationship with the order.

Other courts have applied a test that considers the evidence of an agency agreement, but applies a more flexible standard.  In *Schuster*, the Seventh Circuit rejected the Commissioner's argument that without a contract, there could be no assignment.  Rather, the court found that "[a] flexible test, allowing consideration of all of those factors, better serves our analysis in attempting to determine whether income is to be taxed against the person or entity who actually earned it or against someone else."  *Schuster v. Commissioner of Internal Revenue Service*, 800 F.2d 672, 678 (7th Cir. 1986).  Under this approach, "whether a member of a religious order earns income in an individual capacity, or as an agent of the order, is a question of law based on general rules of agency to be established by considering all the underlying facts."  *Fogarty. v. United States*, 780 F.2d 1005, 1012 (Fed. Cir. 1986).  Borrowing from *Fogarty*, the *Schuster* court outlined six such factors:

> 1) [T]he degree of control exercised by the Order over the member; 2) ownership rights between the member and the Order; 3) the purposes or mission of the Order; 4) the type of work performed by the member *vis-a-vis* the purposes or mission; 5) the dealings between the member and the third-party employer, including the circumstances surrounding inquiries and interviews, and the control or supervision exercised by the employer; and 6) the dealings between the employer and the Order.

*Schuster*, 800 F.2d at 678.

The court is persuaded that the *Schuster* approach best serves the objective of taxing income to the appropriate person.  To limit the anticipatory assignment of income doctrine to a

---

emphases or applications.
[3]     The court notes that under this stricter standard, Defendant would fail outright.  Although Defendant argues that "[t]he Church does have a contract with each ministers' secular employers," (Dkt. No. 18, 65) Defendant has not directed the court to such an employment contract between the Church and Kaiser Permanente.  Without such

black and white test that hinges on whether a contract does or does not exist may result in income being taxed to a person who, within the meaning and objectives of the Internal Revenue Code, did not control the income or receive it for his or her own benefit.  Such a test may allow possible pitfalls for a legitimate assignor and create an easily navigable course for a clever scammer.  The more flexible approach, therefore, better serves the purpose of determining the true intent of the parties – and the statute – by looking to the six *Schuster* factors to determine if the Church "retains dominion over the income-generating asset."  That said, the court does not suggest that the facts need only tip the balance slightly in favor of a defendant for him to be successful.  If this were the case, gaps and holes would be unintentionally created which could be easily exploited by a crafty scam.  Rather, the court holds that to overcome the presumption that income accrues to the person who performs the work, a defendant must demonstrate that the aggregate of these factors weighs substantially in his/her favor.  Indeed, even one factor weighing against a defendant could prove dispositive and disqualifying.

### a.   *The Degree of Control Exercised*

Under this analysis, the first consideration is the degree of control exercised by a religious organization over its members.  In *Schuster*, the court considered the case of a Roman Catholic nun who was a professed member of the Order of the Adorers of the Blood of Christ. *Schuster*, 800 F.2d at 673.  As a condition of membership, Schuster took perpetual vows of poverty, chastity and obedience.  *Id.*  She further agreed to never claim or demand compensation for the work she did.  *Id.*   Members of the Order were allowed to secure employment in occupations that related to the Order's general purposes, subject to approval by a Provincial Superior of the Order.  *Id.* at 673-74.  Consistent with this policy, Schuster obtained permission from her Order to apply and interview for positions in health manpower shortage areas.  Schuster was subsequently offered, and accepted, employment with the National Health Services Corps.

---

evidence at this stage in the litigation, such a bald proffer fails.

*Id.* at 674.   National Health Services wrote Schuster's paychecks payable to her, which she then endorsed in favor of the Order.  *Id.* at 675.  The court also found, however, that Schuster "remained free to withdraw from the Order at any time."  *Id.* at 6778.  As such, the court ultimately held that, although the Order "retained authority to control Schuster's daily routine, the Order did not in fact exercise such day-to-day control."  *Id.* at 678.

The *Schuster* dissent disagreed, finding it troubling that the majority's decision implied that a person presumed to remain free to withdraw from their religious affiliation at any time is not, prior to withdrawing, controlled by a church or order for purposes of the anticipatory assignment of income doctrine.  *Id.* at 680.  This court is similarly troubled by the implications of the majority's decision.  If being free to withdraw from a religious organization is sufficient to preclude a finding that a person is under a church's control, then no person claiming a tax exemption due to a religious vow of poverty could possibly meet the *Schuster* test in a free religious society.  Because of this concern, this court declines to follow this particular application of the *Schuster* factors.[4]  Nevertheless, the court recognizes that determining whether an organization has the requisite control over an individual, as a matter of law, will remain difficult.  Indeed, each case must be decided on the specific facts and merits unique to it.  For example, a personal submission to an organization, such as a vow of poverty, may not in every circumstance be an enforceable contractual obligation.  *See Order of St. Benedict v. Steinhauser*, 234 U.S. 640, 648 (1914) (noting that a priest's obligation to an order pursuant to a vow "runs with his membership and the latter may be terminated at will").  Thus, a contractual legal duty cannot be the determinative standard.  Nevertheless, such vows may be as morally binding to the individual as could be enforced under a legal duty.  To address such varying situations, a court should

---

[4]       It is unknown whether the nun's ability to leave her order was dispositive to the court's decision in *Schuster*, but it is ultimately unimportant for purposes of this case.  What is clear to the court is that Mr. Calkins falls so short of the factors under the anticipatory assignment of income doctrine, that even if the nun in *Shuster* were found not to have had taxable income, such a finding would have no bearing on this court's decision in this

determine whether the requisite dominion has been satisfied by looking to the member's own statements about his or her submission to the religious order, the conduct that would evidence the sincerity of those statements, and the religious order's own affirmative acts of control.

When the *Schuster* factors are applied to this case, the facts fail to persuade that the Church exercised sufficient dominion over Mr. Calkins to satisfy the control requirement.  The court recognizes that he has taken a vow of poverty with the Church[5] and claims to have assigned to it the approximately $60,000 per year he earns as a histotechnologist for Kaiser Permanente.  Nevertheless, he is a Form W-2 employee and, prior to his becoming a Church minister, his employer had deposited his payroll checks into a personal account bearing Mr. Calkins' name.  He controlled the funds and how he wanted them disbursed.  After he became a minister, he continued to exercise that control by directing Kaiser Permanente to deposit his paychecks directly into a Church account.  Significantly, he continues to receive employee benefits from Kaiser Permanente, including health care, sick leave, and vacation days, notwithstanding his claim to have assigned all his compensation to the Church.  Furthermore, Mr. Calkins did not seek permission of the Church to apply for the job or its consent prior to accepting the position.  Indeed, the Church played no role in his finding or continuing his employment with Kaiser Permanente, and there is no evidence that the Church exercises any direct control over the work that he performs for that employer.  (Dkt. No. 27, 8-9.)   There is no basis to conclude that Mr. Calkins does not continue to exercise control over his pay and if he chose to do so, could direct his employer to deposit his pay into his personal account.

Furthermore, despite the Church's "agency assignment" instructing Mr. Calkins, after he had already been working for some time in the same position, "to pursue work in histotechnology at Kaiser Permanente Medical Center, San Diego, CA," the court finds that such

---

matter.
[5]        Because Mr. Calkins suffices as an example of this prong, an analysis of other ministers is unneeded.

an assignment is legally illusory.  (Dkt. No. 27, 13.)  Read in practical terms, the agency

assignment says little more than "keep doing what you're doing."  In the end, there is no

evidence that either the employment relationship with or the personal benefits to Mr. Calkins

changed in any material way when he became a Church minister.  Indeed, the Church's

involvement in the employment relationship appears to serve no purpose but to support an

argument that the income is not taxable to Mr. Calkins.  All of these factors weigh substantially

in favor of a conclusion that the income Mr. Calkins earned from his work for Kaiser

Permanente accrued to him and not to the Church.

### b.  *Ownership Rights Between the Member and the Religious Order*

The second consideration is whether the taxpayer or the religious order has ownership or

entitlement to the compensation at issue.  Hartshorn argues that the Church has ownership or

entitlement to Mr. Calkins' income because Mr. Calkins assigned his income to the Church by

causing his paychecks to be deposited directly by Kaiser Permanente into a Church account.

(Dkt. No. 32, 15.)  The alleged "assignment" of income, however, begs the question.   Under the

anticipatory assignment of income doctrine, the fundamental issue is not whether the income was

assigned, but rather who owns and controls the income generating asset itself.   In this case that

asset is Mr. Calkins' employment agreement with Kaiser Permanente.

It is undisputed that the Church was not a party to the original employment agreement.

Further, there is no evidence that Kaiser Permanente accepted assignment by Mr. Calkins of his

employment contract to the Church.  This factor may nevertheless weigh in favor of Hartshorn

should he be able to demonstrate that the Church had an interest in the employment contract.

The Church may have such an interest if it could show that it were the primary provider of the

service and that it provides that service through its members.  There is, however, no evidence in

this case to support such a conclusion.

In the alternative, Hartshorn may show that this factor weighs in his favor by proof that the Church was a third-party beneficiary of Calkins' employment contract.  The Supreme Court of Utah has explained the requirement for proving a third-party beneficiary as follows:

> Generally, the rights of a third-party beneficiary are determined by the intentions of the parties to the subject contract.  Where it appears from the promise or the contracting situation that the parties intended that a third party receive a benefit, then the third party may enforce his rights in the courts and is deemed a donee beneficiary.  Where, however, no intention to make a gift appears and performance of the promise satisfies or recognizes an actual or supposed duty of the promisee to the beneficiary, then the third party may still recover as a creditor beneficiary.  But where any benefits to a person are incidental to the performance of the promise and such person is neither a donee nor a creditor beneficiary, he is a stranger to the promise and may assert no rights thereunder.

*Tracy Collins Bank & Trust v. Dickamore*, 652 P.2d 1314, 1315 (Utah 1982).

Applying the principles stated by the Utah Supreme Court, the court finds no evidence before it to support a conclusion that the Church was an intended third-party beneficiary under Mr. Calkins' employment agreement with Kaiser Permanente.  The intent to be determined must be that of both contracting parties – in this case Mr. Calkins and Kaiser Permanente.  *See Oxendine v. Overturf*, 1999 UT 4, ¶14 (Utah 1999) ("The predominant inquiry in any third party beneficiary case is whether the contracting parties clearly intended the third party to receive a separate and distinct benefit from the contract.").  Nothing in this record indicates that Kaiser Permanente intended to confer any benefit upon the Church.  Indeed, the employment contract was consummated before Mr. Calkins began his affiliation with the Church.  Nor is there evidence that suggests that the Church can be presumed to be a creditor beneficiary.  Any benefit to the Church was purely incidental based upon a request by Mr. Calkins to which Kaiser Permanente had no objection.  It is fair to infer that as long as Mr. Calkins did the required work, Kaiser Permanente was indifferent to what he did with his compensation.  Accordingly, the Church is but "a stranger to the [employment contract] and may assert no rights thereunder."

In contrast, Mr. Calkins *has* received and continues to receive individual financial benefits from his services provided to Kaiser Permanente. He continues to receive health care, sick leave and vacation day benefits. These benefits by contract are owned by Mr. Calkins, are paid to Mr. Calkins, and enjoyed by Mr. Calkins. And, if Mr. Calkins were not granted these benefits under the terms of his employment agreement, he alone would have the right to seek relief against Kaiser Permanente. It is, therefore, apparent that the Church has no contractual right as a third-party beneficiary to Mr. Calkins' income at the moment it is earned. Therefore, as in *Schuster*, Mr. Calkins' "entitlement to the compensation [is] clearly superior to the Order's." 800 F.2d at 678. The second factor thus also weighs substantially in favor of the United States and against Hartshorn.

### c.   *The Mission of the Order Compared to the Work Performed by the Member*

The third and fourth prongs of the *Schuster* factors require the court to consider the mission of the order and the type of work conducted *vis-à-vis* that purpose or mission. The stated mission of the Church includes providing compassionate acts to others. Mr. Calkins' employment at Kaiser Permanente in providing healthcare is consistent with this mission. The fact that Mr. Calkins had been working in this same capacity prior to his calling as a minister does not change that conclusion. The third and fourth factors, therefore, weigh in favor of Hartshorn, but only slightly because there is no evidence that Mr. Calkins' motivations were directed or changed as a result of his becoming a minister in the Church.

### d.   *The Dealings between the Member and the Third-Party Employer and Between the Employer and the Order.*

The fifth and sixth *Schuster* factors require the court to consider the dealings between the member and the employer, and between the order and the employer. This factor includes a consideration of how the employee found the employment and the control or supervision exercised by the religious organization. As already noted in this case, the Church was not

involved in Mr. Calkins' applying, interviewing or accepting his position at Kaiser Permanente.

And as also previously noted, there is no evidence of any communication between the two

entities directing Mr. Calkins' work in any legally significant way.  Rather, the only role that the

Church has ever had in the employment relationship was to instruct Mr. Calkins, after he

professed to be a minister, to continue doing what he was doing, and then to accept deposit of his

checks.  Indeed, if this were a legitimate tax-avoidance structure, the court would expect to find

some sort of legally binding relationship between Kaiser Permanente and the Church.  None

exists.  This factor weighs in favor of the United States.

### ii.    Summary of the *Schuster* Factors

The court concludes that based upon the undisputed facts, the foregoing factors in the

aggregate weigh substantially against Hartshorn as a matter of law.  Despite the "skillfully

devised" arrangement, the Church was not in any meaningful way involved in Mr. Calkins'

employment with Kaiser Permanente.  The Church did not participate in Mr. Calkins' obtaining

his employment.  The Church was not a party to the employment contract or a third-party

beneficiary.  The Church did not direct Mr. Calkins' work or have responsibility to provide

others to perform the work should Mr. Calkins cease doing so.  Although the work Mr. Calkins

performed was consistent with the stated mission of the Church, he did not undertake that work

in pursuit of his ministry.  He merely continued to do what he had been doing before becoming a

minister.  The Church's only substantive connection to Mr. Calkins' employment was its

acceptance of his pay check, an arrangement that Mr. Calkins could change at any time.  The

court, therefore, holds that based upon the facts presented on this motion, the services rendered

to Kaiser Permanente by Mr. Calkins resulted in taxable income to Mr. Calkins.  Thus,

Hartshorn's statements that Mr. Calkin was exempt from certain tax obligations due to his

relationship with the Church were false or fraudulent.  Because the court has concluded that the

United States has proven, as a matter of law, that Hartshorn's statements were false or fraudulent

under the anticipatory assignment of income doctrine, the court need not decide if they also satisfy the requirements for nominee fraud.

### C.  Hartshorn Knew or Had Reason to Know that his Statements Were False or Fraudulent.

To prevail on summary judgment the government must prove, as a matter of law, that Hartshorn knew or should have known that his representations about the tax benefits of being a minister in the Church were false or fraudulent.  (Dkt. No. 15, 15.)   The government may satisfy this requirement by showing "what a reasonable person in the [defendant's] . . . subjective position would have discovered."  *Estate Pres. Servs.*, 202 F.3d at 1103.  In making this determination, the court begins with the assumption that the "average citizen knows that the payment of income taxes is legally required."  *Schiff v. United States*, 919 F.2d 830, 834 (2d Cir. 1990).  Thus, in this case, the issue turns on whether Hartshorn knew or should have known that Mr. Calkins would have taxable income attributable to him notwithstanding Hartshorn's advice that by becoming a minister and following Church protocol, Mr. Calkins would be exempt from taxation.  Hartshorn opposes summary judgment, arguing that he did not make false claims, did not give tax advice, and had no reason to know that his statements about the tax consequences of Church membership were false.  (Dkt. No. 18, 65-66.)  He asserts that various jurisdictions in which ministers serve have taken different positions on the status of the Church.  He fails, however, to cite any support for this position.  *Id.*  Hartshorn further argues that the Church is not in violation of law, that he continues to practice his faith through his Church, and his belief in the religion has not changed.  *Id.*  The opposition misses the point.  As noted initially, for purposes of this motion, the court assumes that the Church is legitimate and also assumes Hartshorn's expression of his religion is sincere.  That is not at issue.  The issue is whether Hartshorn had reason to know that his advice to other ministers that they could avoid tax on income they earned by assigning it to the Church was false or fraudulent.

The United States argues that notwithstanding his denials, Hartshorn is charged with knowledge of the fraudulent nature of his statements because similar tax avoidance theories have been consistently rejected by the courts and various I.R.S. rulings.  (Dkt. No. 15, 15) *citing United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985).   Indeed, the I.R.S. has ruled:

> [I]t is a basic principle of Federal income tax law that an assignment or similar transfer of compensation for personal services to another individual or entity is ineffectual to relieve the taxpayer of Federal income tax liability on such compensation, regardless of the motivation behind the transfer . . . .  [I]n order for the employment of a member of a religious order to constitute the exercise of duties required by such order . . . the services performed in such employment must be of the type that are ordinarily the duties of members of the order and must be performed by the member as part of the duties that are required to be exercised for or on behalf of the religious order as its agent . . . .  [Furthermore,] a religious order is not engaged in the performance of services as a principal where the legal relationship of employer and employee exists between the member and a third party with respect to the performance of such services.  However, where a member of a religious order is directed to perform services for another agency of the supervising church, or an associated institution, the member will be considered an agent of the order.

Rev. Rul. 77-290, 1977-2 C.B. 26.

The court is satisfied that this regulation sufficiently explains the anticipatory assignment of income doctrine such that Hartshorn knew or should have known that his statements about the tax liabilities of the Church's ministers were either false or fraudulent.  These rulings are publicly available on the I.R.S. website and were readily available to Hartshorn.  Moreover, he has demonstrated his familiarity with tax laws and regulations and his ability to access those materials.  Accordingly, the court finds that Hartshorn knew or should have known that the relevant statements he made were false, as a matter of law.

### D.  Hartshorn's Statements Were Material.

To be material, a statement must be such that it "would have a substantial impact on the decision-making process of a reasonably prudent investor and includes matters relevant to the availability of a tax benefit." *United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990) (citations omitted).  In this case, it is undisputed that a number of ministers acted upon

16

Hartshorn's advice by not filing tax returns for the years in which they had "assigned" their income to the Church.  Indeed, is defies logic to believe that Hartshorn's advice would have been given were it not intended to impact "the decision-making process" of the Church's ministers in deciding whether to file their tax returns.  In any event, given the potential penalties for not paying taxes, a "reasonably prudent investor" would need heavy assurances before risking I.R.S. assessments.  Hartshorn provided these assurances through a persuasive, albeit flawed analysis of I.R.S. regulations.  There is no evidence before the court to support even an inference that the Church's ministers generally, and Mr. Calkins specifically, would have avoided payment of income taxes on their own accord.  (Dkt. No. 27, 25.)  The evidence is sufficient for the court to conclude, as a matter of law, that the statements were material.

### E.  An Injunction is Necessary to Prevent Future Violations.

The government lists the following factors as appropriate for the court to consider in determining whether an injunction is necessary (Dkt. No. 15, 37):

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations would be anticipated.

*Estate Pres. Servs.*, 202 F.3d at 1105 (citations omitted).

Hartshorn acknowledges that these are the appropriate considerations.  (Dkt. No. 32, 26.)  The undisputed facts support that each of these elements has been satisfied and that an injunction is necessary in this case.  The harm suffered by the United States is evident from the loss of tax revenue.  The harm caused to the ministers is apparent from the risk they face for fines, penalties and other legal proceedings for failure to report and file tax returns.  The failure of Hartshorn to advise ministers of at least the uncertainty of his tax position and the risk inherent in following his advice satisfies the scienter requirement.  More importantly, it is evident from Hartshorn's position that he has not accepted that the advice he gave is misguided and that, absent an

injunction, he will continue to advise ministers to not report their earnings to the I.R.S.  For these reasons, the court concludes that an injunction is necessary and should be entered upon summary judgment.

## II.     A Permanent Injunction Under I.R.C. § 7408 Is Necessary.

Section 7408(b) of the Internal Revenue Code provides that the court "may enjoin [a] person from engaging in . . . activity subject to penalty under [the Internal Revenue Code]." Such conduct includes aiding and abetting the understatement of tax liability.  The elements necessary to prove a violation include any person, "(1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document; (2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and (3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person."  I.R.C. § 6701.  From the discussion in prior sections, it is clear that all three requirements have been met in this case.

## III.    A Permanent Injunction Under I.R.C. § 7402 Will Not Issue.

The government also requests injunctive relief under § 7402 to prevent Defendant from "continuing to interfere with tax enforcement."  (Dkt. No. 15, 21.)  In addition, the government asks the court to order Defendant to take other affirmative action, including providing names and addresses of ministers who may have relied upon Hartshorn's advice.  Under I.R.C. § 7402, this court is authorized to issue an injunction "as may be necessary or appropriate for the enforcement of the internal revenue laws."  Indeed, this authorization is broad, permitting the court to "enjoin interference with tax enforcement even when such interference does not violate any particular tax statute."  *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984).

Notwithstanding this broad authority, the court at this point denies the relief requested under § 7402. Hartshorn, by this ruling, is now on notice that the income obtained through the services rendered by Mr. Calkins to Kaiser Permanente is taxable to Mr. Calkins. Whether the facts of other particular ministers may support a different conclusion remains unresolved. Their particular circumstances may meet the Internal Revenue Code requirements necessary to avoid tax liability. Those circumstance, however, would have to be substantially different than the facts presented by Mr. Calkins and others presented by the United States in support of this motion.

The court will not, however, grant an injunction under § 7402 at this time absent additional evidence that, after this decision, Hartshorn continues to promote the same tax avoidance arrangement that is addressed in this decision. The court concludes that the present record is inadequate for the court to find that the injunction requested by the United States is necessary to "prevent Hartshorn from continuing to disrupt the federal tax system." Such an assertion is simply too broad to have persuasive effect. (Dkt. No. 15, 22.) It should be clear to Hartshorn, however, that he now has notice of the law and that if he continues his actions or attempts to cleverly distinguish future actions from the particulars of the violative conduct discussed in this memorandum decision and order, the court will not be sympathetic. It would also be appropriate for Hartshorn to undertake all necessary actions to correct any advice he has given to other ministers and to assure that the Church's directions and instructional manuals are consistent with this decision. Should he fail to take such actions, the court will entertain a request by the United States for further relief.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is GRANTED in part and DENIED in part. On or before March 15, 2012, the government shall submit a proposed form of order granting the injunction and describing with detail the conduct

that is to be prohibited.  Any objection Hartshorn may have to the proposed form of the order

shall be submitted on or before March 22, 2012.

DATED this 9th day of March, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge